Filed 12/1/15  P. v. Rose CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>CLEVELAND ZACHARY ROSE et al.,<br><br>　　　Defendants and Appellants. | B254912<br><br>(Los Angeles County<br>Super. Ct. No. BA370760) |

　　　APPEALS from judgments of the Superior Court of Los Angeles County. Robert J. Perry, Judge.  As to Rose and Hicks the judgments are affirmed as modified. As to Brown the judgment is reversed as to Count 1.

　　　Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Cleveland Zachary Rose.

　　　David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Rondrae Hicks.

　　　Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Charles Deon Brown.

　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

In Count 1 of the fifth amended information filed by the Los Angeles County District Attorney's Office, Cleveland Zachary Rose (Rose), Kevin Rondrae Hicks (Hicks) and Charles Deon Brown (Brown) (collectively defendants) were charged with conspiracy to commit kidnapping for robbery (Pen. Code, §§ 182, subd. (a)(1), 209, subd. (a))[1] and conspiracy to commit second degree robbery (§§ 182, subd. (a)(1), 211, subd. (a)). In Counts 2 and 3, respectively, Rose was charged with possession of a firearm by a felon (former § 12022, subd. (a)(1)) and unlawful possession of ammunition by a felon (former § 12316, subd. (b)(1)). In Count 4, Brown was charged with unlawful possession of ammunition by a felon (former § 12316, subd. (b)(1)). For all defendants, as to Count 1, it was alleged that a principal was armed with a firearm (former § 12022, subd. (a)(1)).[2]

The defendants were convicted on all counts.[3] The firearm allegation was found true.

Brown argues the trial court erred when it denied the motion to sever his trial; when it refused to suppress evidence of the phone number he provided during booking; when it refused to exclude charts and graphs prepared by expert Michael Easter (Easter) even though the prosecution violated discovery rules by not turning over Easter's charts and graphs until five days before he testified; when it instructed the jury regarding late discovery pursuant to CALCRIM No. 306; and when it permitted evidence of weapons, weapon parts, ammunition, a scanner, walkie-talkies and a brown leather holster. Hicks argues the trial court erred when it denied the motion to sever his trial, when it allowed evidence of a federal conviction based on a plea agreement he signed in 1996 involving a

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The operative charging document, the fifth amended information, contained other special allegations. Because this appeal does not pertain to those other special allegations, we do not list them here.

[3]     In 2012, Brown entered a plea of no contest to Count 4. His appeal pertains to Count 1 only.

plan to rob a bank, and when it denied a defense request to strike the firearm allegation. Rose contends the trial court abused its discretion when it refused to suppress monitoring data obtained without a warrant from Global Positioning System (GPS) tracking devices placed on two vehicles that he used. He additionally posits that the trial court erred when it allowed evidence of a prior federal conviction based on a plea agreement he signed in 1998 involving a plan to rob a bank. Each of the defendants joins the arguments of the others insofar as they derive a benefit.

Brown's conviction on Count 1 is reversed because the trial court abused its discretion and otherwise violated Brown's right to due process when it denied the motion to sever his trial. As to Rose and Hicks, the firearm enhancements pursuant to former section 12022, subd. (a)(1) are stricken because there was insufficient evidence that a principal was armed during the commission of the charged conspiracy. In all other respects, the judgments are affirmed. Upon remand, it is permissible for the Los Angeles County District Attorney to retry Brown on Count 1.

The People ask us to amend Rose's judgment and abstract of judgment to impose a $40 assessment pursuant to section 1465.8, subdivision (a)(1) on Count 2 and Count 3, for a total of $80, and a $30 assessment pursuant to Government Code section 70373, subdivision (a)(1) on Count 2 and Count 3, for a total of $60. Because the trial court already imposed the correct assessments, we need not take action.

## FACTS

**Prosecution Case**

*Rose's Relationship with Cornelius Hopes*

In the mid-2000's, Rose worked at a door factory with a man named Cornelius Hopes (Hopes). After the company closed, they remained in contact. At some point, Hopes learned from Rose that he had been involved in criminal activities such as robbing banks.[4]

---

[4] This evidence was limited to Rose.

3

*Rose's Cashier's Check Scheme*

In 2009, Rose called Hopes and they spoke about the poor state of their finances. During that colloquy, Rose asked Hopes to cash a cashier's check and said he could keep a third of the proceeds. A few weeks later, Rose and a woman met Hopes outside a Wells Fargo Bank and gave Hopes a $7,500[5] check he knew was stolen or forged.[6] He deposited the check into his account. After a 10-day hold, when the money was finally available, he withdrew either $3,500 or $5,000 and gave it to one of Rose's female friends.

*The FBI's Contact With Hopes*

In early January 2010, Special Agent Conley and his partner contacted Hopes at his home and asked him about the cashier's check he had cashed. Hopes said he had done it for a friend. When pressed, he said the source of the check was Rose. At the behest of the special agents, Hopes called Rose at telephone number (323) 347-5235[7] and put the call on speaker so the special agents could listen. Hopes said the bank claimed the cashier's check was fraudulent, and he wanted to be reimbursed for his losses. Rose said he would not give Hopes any reimbursement. Hopes went on to say that he had been contacted by the FBI, and they asked him about the check he cashed at Wells Fargo Bank. He said the FBI did not believe his story that he got the check from work. Rose told Hopes to stick with his story.

---

[5]  Hopes testified that the amount was $5,000, and later testified that it was $7,500 after being shown the check that he negotiated.

[6]  Special Agent Patrick Conley of the Federal Bureau of Investigation (FBI) testified that the cashier's check given to Hopes came from a bank that was robbed in El Monte on December 10, 2009.
All references to special agents are to special agents of the FBI.

[7]  The number (323) 347-5235 was assigned to a prepaid phone that was used by Rose. On August 13, 2009, an account was set up for that number under the name "Jhonte Moore." On March 8, 2010, the account was switched to a subscriber with the name "Anjane Lewis."

At some point, Hopes told the special agents that Rose had asked him to help rob a bank near Artesia.

*Inquiries at the Department of Motor Vehicles (DMV) Regarding Paula Williams*

Paula Williams (Williams) was a manager for a Bank of America banking center at 1450 West Redondo Boulevard in Gardena.

Isela Saenz, a DMV staff service analyst, determined that on January 26, 2010, "W.M.I. Insurance" accessed the license plate number for Williams's car. On January 29, 2010, a DMV employee, who was not identified, accessed information for the same license plate on two occasions, but did not perform any actions. The employee would have been able to access Williams's name and address. Williams never heard of "W.M.I. Insurance."

*January 27, 2010 Phone Call*

On January 27, 2010, at 9:00 a.m., there was a call from Rose's phone to (323) 684-8625, the number assigned to a prepaid phone that was associated with Brown.[8]

*Hopes's Interactions With Rose; the First of Two GPS Trackers*

Hopes met with Rose on January 27, 2010, at a Starbucks. Prior to the meeting, FBI agents gave Hopes a keychain recording device to record his conversation with Rose. During the meeting, Rose said that he needed the license plate numbers for bank personnel, and he wanted to rob a bank before February 14, 2010. He said he had "two that's on deck," which Hopes understood from previous conversations to mean Rose was looking at two different banks. Rose asked Hopes to watch bank employees to find out their routines because Rose planned to go into the bank with the first employee and have him or her open the vault and "clean it out."

In the meantime, while Rose was occupied, special agents placed a GPS tracker on his car, a Chrysler 300 (Chrysler).

---

[8]     The billing account name for the phone was "Bobby Jerkos." The billing address was in Newport Beach.

On February 1, 2010, Hopes called Rose.  Hopes said he had a contact at the DMV who could get the license plate information that Rose wanted.  Rose said he had already obtained the information.  But he also said for Hopes to keep his contact "on deck."  Hopes said he needed to do something to make money, and Rose told him to "deal with that one" by watching the Wells Fargo Bank where he had deposited the cashier's check.

On February 11, 2010, Hopes called Rose and provided false information about his Wells Fargo Bank.  Rose instructed Hopes to watch the bank and identify the person who opened it up in the morning

On February 19, 2010, Rose asked Hopes to meet him for lunch.  Hopes was unable to contact Special Agent Conley and inform him about the meeting, so Hopes did not have a recording device.  At a TGI Friday's restaurant in the Cerritos Town Center, Hopes joined Rose and a woman.  According to Rose, he had found a better bank to rob in Mission Viejo, and he and his crew had been watching the bank's president, who was a Black female.  He also said that he planned on finding out where the bank's president lived, when she left home in the morning, and when she left work at night.

After lunch, Hopes told Special Agent Conley that Rose and his crew had targeted a Bank of America branch, identified the bank manager as a Black female, and intended to kidnap her.

On March 4, 2010, Hopes met Rose at the Cerritos Town Center and recorded the conversation.  Rose said he wanted the license plate number for the car driven by the manager of the Wells Fargo Bank where Hopes had deposited the cashier's check.  Hopes gave appellant Rose false information about bank employees.  Eventually the conversation pivoted to a bank in Mission Viejo, and Rose talked about kidnapping the bank manager, going into the bank with her, and then going into the vault.  Rose believed the bank manager would cooperate because she would be fearful of losing her life.[9]

---

[9]    Hopes testified that he asked Rose how he used to rob banks before they met.  Prompted by Hicks' counsel, the trial court stated that "[e]arlier incidents are limited only to Mr. Rose."

6

In recorded telephone conversations on March 17, 2010, and March 26, 2010, Rose said he was waiting for information. Hopes inferred Rose was talking about license plate information from his contact at the DMV. On April 2, 2010, Rose indicated that he was still waiting. On April 14, 2010, Rose asked Hopes to take a drive to show him something, which Hopes understood to mean Rose wanted to show him "the location of a situation he was working on." They never spoke again.[10]

*Rose's Girlfriend; Surveillance of Rose; Tracking of Rose's Phone and the Chrysler*

Guermena "Cindy" Fuller (Fuller) was Rose's girlfriend, and she was pregnant with his child in January 2010.[11] At the time, she was living in an apartment at 511 East 99th Street in Inglewood. Rose stayed with her "sometimes," maybe two or three times a week. She allowed him to use her car, which was a blue BMW (BMW).

On January 28 and 29, 2010, and on February 1, 2010, cell phone activity and the GPS tracker on the Chrysler placed Rose's car and cell phone near the Gardena Bank of America. In the evening of February 2, 2010, his cell phone registered activity at a cell tower near Williams's home.

In the morning of February 3, 2010, Special Agent Jaime Barajas and his team observed Rose drive the Chrysler out of the parking lot at Fuller's apartment. Special Agent Barajas followed. While accompanied by someone driving Fuller's BMW, Rose drove to an auto body shop located in Los Angeles. They arrived at the auto body shop at about 10:25 a.m., and then departed in Fuller's BMW at around 12:09 p.m. Subsequently, Special Agent Barajas observed Rose in a Dodge Caliber (Dodge) that he picked up from a rental agency.[12]

---

[10]     Hopes was paid $4,000 by the FBI for being a confidential informant.

[11]     He had previously fathered a child with Shupree Jenkins, who Fuller believed to be living in Harbor City.

[12]     In testimony, there are references to a Dodge Caliber and a Dodge Crossover sports utility vehicle. At one point a witness testified that the "Caliber" was the model of

7

Pursuant to an FBI request, Gardena Police Officer Luis Contreras and his team watched the Gardena Bank of America. On February 3, 2010, at about 8:00 a.m., the BMW parked across the street at a post office. The driver, a Black male, held a cell phone to his ear. After about five minutes, the driver departed from the area. People in business attire began entering the bank at that time.

On February 3, 2010, Rose's cell phone was used to make calls near the Gardena Bank of America. On February 4, 2010, calls were made near Williams's home.

Over the days Rose was being watched, he was observed at Fuller's apartment complex, and also entering an apartment complex at 26110 President Avenue in Harbor City.

A call from Rose's phone was made to Hicks's phone at about 11:19 a.m. on March 9, 2010. Hicks's phone, which had the assigned number (323) 333-4756, was located in Laguna Hills at the time.

*Traffic Stop and Searches Near the Farmers & Merchants Bank*

On March 9, 2010, at about 1:20 p.m., Orange County Deputy Sheriff Emad Mitry noticed a black Dodge Durango (Durango) with a broken brake light and Carmax paper license plates. Hicks was driving and Brown was the only passenger. They were east of Paseo de Valencia on El Toro Road in Laguna Hills. Deputy Mitry activated his patrol car's red light. Hicks proceeded down El Toro Road for about a half of a mile and then turned onto Swartz Road before he finally came to a stop on a dead end street leading to a commercial complex. The car was covered with what looked like dust that had accumulated for a week. There were wrappers on the floorboards, and there were items in the back

When questioned why he had paper license plates, Hicks said he took off the metal plates because he planned to show the vehicle to a prospective buyer. According to Hicks, the prospective buyer had requested that the metal plates be taken off. Hicks

the Dodge Crossover, and then proceeded to refer to the vehicle as a Dodge "Crossover Caliber."

8

claimed to have met the prospective buyer earlier that same day. However, he could not recall the prospective buyer's name or telephone number, and did not recall where they met.

Deputy Mitry asked Hicks why he was in the area. He said he was on his way home from San Diego and stopped to get something to eat.[13]

After Hicks consented to a search of his vehicle, Deputy Mitry and another deputy sheriff looked in the back and discovered metal license plates matching the vehicle's registration. In the center console, Deputy Mitry found a "nylon cap or mask" with "eye cutouts on it."

Rose was sitting in a Chevy Suburban parked at a fast food restaurant 100 feet away from where the traffic stop occurred. Orange County Deputy Sheriff Thomas Graham asked Rose what he was doing in the area, and he said he was waiting for his two friends who had been pulled over. Rose indicated that he was waiting for his friends in the Durango. When asked how he knew them, he said they played football together during their school years. Deputy Graham searched Rose and found a piece of paper in his wallet that had the address for Farmers & Merchants Bank, 24300 Paseo de Valencia, Laguna Hills. The bank was about a mile away from the traffic stop.

Inside the Chevy Suburban, Deputy Graham found a detachable black pistol grip, two beanies, a pair of gloves, two nylon "masks" or "skullcaps," a cell phone, and some marijuana.

At some point, after talking to Rose, Deputy Mitry asked Brown if he knew Rose. Brown said he did not.

Brian Heaney, a sergeant in the Orange County Sheriff's Department, observed the traffic stop as it progressed. After Hicks and Brown drove away in the Durango, Sergeant Heaney and six team members of a plain clothes surveillance team followed the Durango as it drove to Los Angeles. The team lost sight of the Durango after it exited the 110 Freeway at Vernon. During the drive to Los Angeles, Hicks drove in a manner

---

[13] On March 9, 2010, no calls were made on Hicks's cell phone from the San Diego area.

9

consistent with countersurveillance designed to expose anyone who might be following him.

*The Second GPS Tracker*

On March 24, 2010, an FBI agent placed a GPS tracker on the BMW. On April 1, 2010, and April 13, 2010, GPS tracking established that the BMW was in the area of Farmers & Merchants Bank in Laguna Hills.

*The Events of April 13, 2010*

Faye Give Kay (Give Kay) worked as the bank manager for Farmers & Merchants Bank in Laguna Hills.

On April 13, 2010, at around 5:00 p.m., in Irvine, Sergeant Heaney was parked near a freeway exit. He saw Give Kay exit the freeway, and then saw Rose exit in the BMW about three cars behind Give Kay. Sergeant Heaney followed them as Rose followed Give Kay until Rose turned on Hartford. At that point, Sergeant Heaney proceeded to a parking lot near Jeffrey and Walnut in Irvine. Soon thereafter, he observed Rose in a commercial parking lot across the street. Brown arrived in a Nissan Maxima (Nissan), and Hicks arrived in a silver Mercedes SUV (Mercedes). Rose got into the front passenger seat of the Mercedes, and Brown got into the back seat. Later, the men drove away in their respective vehicles.

Orange County Sheriff's Department Investigator Tony Benfield went to Give Kay's house on Montgomery in Irvine and saw her pull into her garage. Within seconds of Give Kay's arrival, a Black male in the BMW drove slowly down Heritage past Montgomery while looking at her open garage. A few seconds after that, a Black male drove slowly down Montgomery in the Nissan. The driver was holding a phone to his ear. When the driver neared the garage, he looked into it. The Nissan turned around in a parking area and returned, once again slowly driving by the open garage. Seconds later, Hicks slowly drove by Montgomery in the Mercedes and looked toward the garage, which was closed. He returned about five minutes later with Rose in the passenger seat. There was a third occupant in the backseat, but Investigator Benfield did not see a face.

10

After what transpired on April 13, 2010, Give Kay moved out of her home.  The FBI placed an agent in Give Kay's home to stay in her home and drive her car back and forth to the bank.

*Surveillance in Late April*

On April 21, 2010, at about 6:00 a.m., Sergeant Heaney was at a gas station at the corner of Walnut and Jeffrey in Irvine.  Brown drove by in the Nissan.  Later that morning, Brown stopped at the gas station, and then drove northbound on the I-5 Freeway.

The next day, April 22, 2010, at the same gas station at about 6:00 a.m., Sergeant Heaney saw Rose driving the BMW on Walnut.  A few minutes later, Sergeant Heaney drove into Give Kay's neighborhood and saw Rose parked near her house on Springfield, a small street that was opposite Montgomery.  Eventually, the special agent posing as Give Kay drove Give Kay's vehicle out of the neighborhood.  About 20 minutes later, Rose drove away.

On April 23, 2010, Special Agent Ruben Iglesias was watching and following Rose.  Rose met with Brown at the corner of East Hyde Park Boulevard and Marlborough in Inglewood.  After about seven to 10 minutes, Brown got into the Nissan and departed.

A day later, Special Agent James Friedman observed Rose drive the Dodge into the residential neighborhood near Give Kay's house and park from 6:26 a.m. to 7:51 a.m.  Rose remained inside his vehicle.  It appeared he was making calls on his cell phone.  After he drove from the area, Rose went to Harbor City.

*Fuller's Request that Rose Remove a Handgun from Her Apartment*

At some point in late April 2010, Fuller saw Rose with a handgun in her apartment.  She asked him to remove it.

*Rose's Arrest and Interview; Search of Residences Associated with Rose*

On April 28, 2010, Rose was arrested in Harbor City.  He possessed two cell phones.  During booking, he listed his address as 511 East 99th Street in Inglewood,

11

his cell phone number as (323) 347-5236, and his emergency contact as Fuller at (310) 946-8456.[14]

During an interview with law enforcement agents, Rose said he lived in Harbor City. He denied knowing or living at a residence on 99th Street in Inglewood, having been to Orange County in the recent past, going to Farmers & Merchants Bank or following Give Kay to her home.

In an apartment at 26110 President Avenue in San Pedro, law enforcement officers discovered a brown leather holster in a bedroom closet.

In Fuller's apartment in Inglewood, they discovered a scanner, a charger for a scanner, and four walkie-talkies in a shoebox in the master bedroom. The items did not belong to Fuller. A Smith and Wesson blue steel .357 revolver with wooden grips, a .44 Magnum, and a box of ammunition were discovered inside a small backpack in the closet in the master bedroom. The .44 Magnum was loaded with six live .357 rounds. The box of ammunition was stamped for .357 rounds. One of the guns had a flash suppressor.

*Hicks's Arrest*

Hicks was arrested the same day as Rose.

During his interview, Hicks admitted knowing Rose but indicated they had not seen each other in a while. Other than passing through Orange County to sell his vehicle in San Diego, Hicks denied being in Orange County. When asked how much he was selling his vehicle for, he paused and then said $10,000. He said he went to San Diego with Brown. Regarding the traffic stop on March 9, 2010, Hicks claimed to have been unaware Rose was parked nearby. Hicks denied being in Orange County with Rose and Brown on April 13, 2010. But when he was shown surveillance photographs, he initially said they had been "hanging out." Later, he said they went to Orange County because

---

[14]     This evidence was limited to Rose.

Rose was "having an issue with a girlfriend." The interviewer asked Hicks about following Give Kay home from work. He did not reply.[15]

*Brown's Arrest; Search of His Home; His Interview*

Following a traffic stop, Brown was arrested on April 28, 2010. During booking, he was asked, inter alia, for his address and phone number. He listed as his address 642 Hyde Park Boulevard, Inglewood, and his telephone number as (323) 684-8625.

When law enforcement officers searched Brown's home on Hyde Park Boulevard, they recovered 41 to 44 rounds of .45 caliber ammunition, four 12-gauge shotgun shells, and an empty magazine for a semi-automatic handgun. They also discovered Sprint bills for (323) 864-6960 and (323) 864-7579. They found no bills for (323) 864-8625.

During an interview, Brown was asked if he saw anyone he knew at the jail. He said he had seen Hicks, an old friend. Brown maintained he had not otherwise seen Hicks in a while. After being told the police had seen him with Hicks recently, he said, "Oh, yes, I was with him last night watching the Lakers game." The interviewer asked if Brown had been to Orange County. He looked "shocked" and denied being there. Once he was confronted with the March 9, 2010, traffic stop in Orange County, he claimed to have been traveling through Orange County from San Diego, where he saw friends of Hicks. The interviewer told Brown that Rose was near the traffic stop. Brown said maybe Hicks was going to meet with Rose, but Brown did not know Rose was present.[16]

**Defense Case**

Hicks's fiancé, Natashia Gardener, testified she lived with Hicks and their three children in Inglewood. In April 2010, she owned the Durango and planned to sell it. Hicks and she were registered owners of the Mercedes. She used nylon stocking caps for her hair, and she kept some of them in the Durango. Hicks's aunt and cousin testified that Hicks went to school in Orange County, and he had family in Orange County,

---

[15]     Evidence of Hicks' interview was admitted only against him.

[16]     The trial court limited this evidence to Brown.

13

including his father, who lived in Irvine.  Hicks went to Orange County "quite a bit" for family events, football games and spontaneous barbecues.

## DISCUSSION

### I.  Motions to Sever by Brown and Hicks.

In California, there is a preference for joint trials against codefendants charged with common crimes involving common events and victims.  (§ 1098; *People v. Carasi* (2008) 44 Cal.4th 1263, 1296 (*Carasi*); *People v. Hardy* (1992) 2 Cal.4th 86, 167.)  Notably, section 1098 provides:  "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials."

"A party seeking severance must 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'  [Citation.]"  (*People v. Davis* (1995) 10 Cal.4th 463, 508.)  "The grounds which may justify a severance [include]  . . . :  (1) Where there is an extrajudicial statement made by one defendant which incriminates another defendant and which cannot adequately be edited to excise the portions incriminating the latter; (2) where there may be prejudicial association with codefendants; (3) where there may be likely confusion from evidence on multiple counts; (4) where there may be conflicting defenses; and (5) where there is a possibility that in a separate trial the codefendant may give exonerating testimony.  [Citation.]"  (*People v. Boyde* (1988) 46 Cal.3d 212, 232.)

An appellate court reviews the denial of a motion to sever for an abuse of discretion.  (*Carasi*, *supra*, 44 Cal.4th at p. 1296.)  Whether a trial court abused its discretion is judged on the facts as they appeared at the time the trial court ruled on the motion.  (*Ibid*.)  "Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial.  [Citation.]"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41.)

In the absence of trial court error, reversal is nonetheless required if joinder caused gross unfairness that violated a defendant's right to due process.  (*People v. Bean* (1988)

14

46 Cal.3d 919, 940.)  Constitutional issues are subject to de novo review.  (*People v. Cromer* (2001) 24 Cal.4th 889, 894.)

According to the Supreme Court, due process requires reversal when joinder results in substantial and injurious effect or influence in determining the jury's verdict. (*United States v. Lane* (1986) 474 U.S. 438, 446; *People v. Albarran* (2007) 149 Cal.App.4th 214, 231.)  "'[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.'  [Citation.]"  (*Ibid*.)

Brown contends that his conviction on Count 1 must be reversed because the trial court erred when it denied his motion to sever his trial from that of Rose and Hicks.  He relies on two theories:  a prejudicial abuse of discretion, and a denial of due process. Hicks advances the same arguments as Brown.

We turn to the issues below.

1. <u>Relevant Proceedings</u>.

In October 2011, the prosecution filed a motion to admit evidence that Rose, Hicks and Brown participated in prior conspiracies to rob banks to show:  the intent of Rose, Hicks and Brown in watching the targeted bank and the home of the bank manager was to gather intelligence to facilitate the commission of bank robbery; the intent of Rose, Hicks and Brown in possessing guns, masks, stockings, gloves, police scanners and walkie-talkies was to commit bank robbery; and they had motive to kidnap the bank manager from her home at night and force her to open the bank vault in the morning instead of waiting for her to arrive at the bank.  The prosecutor planned to prove Rose's prior based on the allocution he signed in connection with a 1998 plea agreement.  To prove Hicks and Brown participated in a conspiracy to commit a bank robbery, the

15

prosecutor planned to call one of their purported coconspirators, Jeffrey Deshawn Halthon (Halthon).

Months later, the trial court entertained the motion.

The trial court stated: "You have evidence in this case [of] . . . Rose following the bank manager for the Farmers & Merchants Bank to her home. He's alleged to have driven by the manager's residence. Brown is alleged to have driven by. Hicks then allegedly drives by. They all meet together in a parking lot, all get into Hicks' Mercedes and then drive by the manager's residence again. [¶] That evidence, coupled with the C.I. information about Rose's statement to him, certainly raises questions as to their intent[,] assuming those acts are proven by the witnesses at trial. And I would think that under [*People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*)], that the fact that Hicks had been engaged or had engaged in 1996 in prior robberies with others, and that those robberies involve nylons, handguns, things like that, and that Rose had conspired with others as well to do bank robberies would be helpful to the jury and relevant to the issue of their intent when they're driving by the bank manager's house."

The trial court said its inclination was to allow the evidence. Continuing on, the trial court stated: "I mean, I think Rose's statement, certainly the jury would be instructed that it only applies to Mr. Rose. If anything, it could be helpful to the other defendants because he was conspiring with persons other than the defendants who are on trial with him, and I suppose there's an argument to be made that there's no evidence that they . . . had anything to do with the 1996 activity. . . . [¶] As to Mr. Hicks, if they have Halthon, I would think that I would allow him to testify." The trial court added: "I understand it's prejudicial and remote."

The case was called for a jury trial on July 31, 2012. On August 2, 2012, the trial court declared a mistrial as to Rose because his attorney suffered a medical emergency. On the heels of that ruling, Brown and Hicks requested a mistrial, which was granted.

A year later, on August 6, 2013, the matter was called for trial again. Because his attorney was ill, the trial court declared a mistrial for Rose. Trial proceeded against Hicks and Brown. The jury did not hear evidence of the prior convictions suffered by

16

Rose and Hicks,[17] and it was unable to reach a unanimous verdict. As to Hicks, the jury was split with 2 votes guilty, 10 votes not guilty for conspiracy to kidnap for robbery, and 1 vote guilty and 11 votes not guilty for conspiracy to commit robbery. As for Brown, the jury was split 3 votes guilty, 9 votes not guilty for conspiracy to kidnap for robbery, and 2 votes guilty and 10 votes not guilty for conspiracy to commit robbery. The trial court declared a mistrial for both Hicks and Brown.

Hicks moved to dismiss the case. The trial court responded as follows: "I'm inclined not to grant the motion. I don't think the People got a fair trial in the sense that Mr. Rose was not part of the case[,] and I think that it would have been a different case[,] and I think it will be a different case. I think that the . . . evidence, frankly, is there. I think it's the question of presenting it. So I'm not inclined to dismiss just because of a jury [voting] 10 to 2 and 11 to 1 for acquittal." Later, the trial court stated: "In the court's view, . . . the People . . . were severely hampered by the absence of the lead defendant, Mr. Rose, and I think it's going to be a different case the [next] time around."

Two weeks before the third trial, the trial court set forth its perception of the case thusly: "The inescapable fact in this case is that these three defendants were acting extraordinarily suspiciously in the area of the bank manager's home down in Orange County, which was 60 or 70 miles from their home, and there is no explanation, other than the explanation that has been given through the testimony of [Hopes] and the fact that some of these folks have prior convictions for bank robbery. It's pretty obvious to the court. [¶] Now, the jury didn't like the case, the last jury. I'm thinking it's a different case with Mr. Rose in the mix. The jury is going to hear about his—he's a convicted felon, he has a prior . . . felony. He has a possession of a firearm, he has possession of ammunition. Perhaps that will tip the jurors."

---

**17** Prior to the third trial, the trial court stated: "I . . . granted the [Evidence Code, section 1101, subdivision (b)] motion as to [Halthon], . . . who [would] have provided evidence against Hicks and Brown." The inference is that the prosecutor did not call Halthon to testify at the second trial.

On January 21, 2014, the case was called for trial. Hicks reiterated all the Evidence Code section 402 motions that he made prior to the first mistrial, and also prior to the August 2013 trial. The trial court stated: "I think that all prior motions are deemed to have been remade[,] and the rulings remade." In addition, the trial court stated that all objections would be deemed joined by Rose, Hicks and Brown unless otherwise stated.

The trial court ruled that Rose's plea in federal court to an attempted bank robbery would be admissible to show intent, i.e., "for the jury to consider as to why . . . Rose . . . would have traveled 70 or plus miles early in the morning to drive by the residence of the bank manager[.]" The prosecutor indicated that when Rose entered the plea, he made a statement in the allocution in which he admitted to conspiring to commit bank robbery with three other men. Further, Rose stated that he had instructed the others on how to carry out the bank robberies, and had planned on providing them with clothes, walkie-talkies, police scanners and firearms. The trial court stated: "And I'm going to instruct the jury [that] that's admissible only as it relates to Mr. Rose[,] because it's a statement against his interest."

Subsequently, Brown moved for a separate trial, and Hicks joined in the motion. In his motion, Brown argued that the prosecutor intended to present the prior convictions to prove that Hicks and Rose previously conspired to commit bank robberies, and Brown would be prejudiced in a joint trial because he could not cross-examine his codefendants. In addition, Brown argued that there was a risk that the jury would find him guilty because of his association with Hicks and Rose.

When the parties convened, the trial court raised the motion to sever and stated: "I'm disinclined to grant it. I think, first of all, it's untimely, but more importantly, this is a conspiracy case. And I think the evidence would be duplicative, and I see no reason to have a separate trial."

After jury selection, the trial court and parties discussed various issues. At one point, they engaged in the following colloquy:

"[DEFENSE COUNSEL]: 'If you honor is allowing [the prosecutor] to simply present those [prior convictions], limited to the defendants that were involved in [those]

18

prior bank robber[ies], why is there a need to make reference to other people involved if it just goes to this specific intent?

"[THE TRIAL COURT]:  No, because it shows these defendants did not act alone on the prior occasion.  In Mr. Hicks's situation or Mr. Rose's situation—you take either one—they were part of a group.  And in this case, they are alleged to be part of a group that was going forward with a nefarious plan.  That's the situation.  I think it all relates to intent.  And the fact that they are willing to associate themselves with someone else, to me, suggests that they pose a greater danger to the public good.  That's why we have conspiracy.

"[DEFENSE COUNSEL]:  But to say affirmatively that these other two individuals had the same intent as, say, Mr. Rose in that robbery or Mr. Hicks in his incident, there is that risk that the jury would infer in this case then that Mr. Brown must have the same intent as these two gentlemen because of his association with them.  And that goes against the court's instruction to evaluate the evidence as it pertains to each defendant.

"[THE TRIAL COURT]:  "I'm going to make a limiting instruction.  And [the prosecutor] is going to make it clear these prior convictions are related to the particular individual, and the other defendants are not involved in that particular prior conviction or those activities."

At trial, the jury heard the evidence below:

In 1998, Rose pleaded guilty to using or carrying a firearm during a crime of violence in violation of title 18 United States Code section 924(c).  The prosecutor read a redacted version of the statement of facts set forth in the written plea agreement, stating: "Beginning on or before December 1995 and continuing until approximately December 1996, . . . Rose][] and Trayvonne Mitchell [(Mitchell)], . . . Shaun Sloan [(Sloan)], and Derrick Lamont Brown, no relation to defendant Brown at all[]  [¶]  . . .  [¶] . . . conspired and agreed [they] would select the banks to be robbed, observe or case the banks to be robbed, recruit others to go inside the banks and commit the robberies, provide those persons with the necessary equipment, such as clothes, walkie-talkies,

19

police scanners, and firearms, and instruct those persons on how to carry out the bank robberies. [They] agreed to divide the proceeds from the bank robberies among [themselves] and the others who participated in the robberies.

"Specifically, [Rose] participated in the planning and organization of the October 7, 1996[,] attempted robbery of the Bank of America at 1053 South Crenshaw in Los Angeles, California. Sloan, [Mitchell] and Brent Reed [(Reed)] . . . cased the bank in preparation for the robbery. Several days prior to the robbery, [Rose], . . . Mitchell and Reed met with . . . [McCreary] and Kenneth Deandre Rodgers (Rodgers) at [Rose's] apartment . . . to discuss and plan the robbery.

"On or about October 7, 1996, [Rose] met with Sloan, Mitchell, McCreary, Rodgers and Reed at Sloan's mother's house . . . in the morning for the purpose of planning an armed takeover robbery of the Bank of America on South Crenshaw. . . . Rose [was] present when Sloan and Mitchell distributed dark clothes, masks, guns, duct tape, walkie-talkies and police scanners to Reed, McCreary [and] Rodgers. . . . Rose[] drove . . . Reed, McCreary and Rodgers to the vicinity of the bank early that same morning. Reed, McCreary and Rodgers switched from [Rose's] car to Mitchell's car and Mitchell drove them to the bank. The plan previously discussed provided that [Rose], Mitchell and Sloan would be outside the bank in separate cars to act as get-away drivers and to communicate with the robbers inside the bank through walkie-talkies.

"At approximately 8:30 a.m., Reed, McCreary and Rodgers forced their way into the Bank of America . . . and demanded access to the vault. Before the bank employees were able to open the vault, Reed, McCreary and Rodgers received information through the walkie-talkie that the police were in the area and they left the bank."

The trial court instructed the jury that Rose's plea agreement was not to be considered as evidence against Brown or Hicks, and could be considered only on the issue of Rose's intent.

In 1996, Hicks pleaded guilty to aiding and abetting attempted bank robbery in violation of title 18 United States Code, section 2113(a) and title 18 United States Code section 2(a). As read by the prosecutor, the plea agreement, signed by Hicks, recited the

following facts: "Early in the morning of August 13, 1996, defendant [Hicks], [Halthon], and five other black males traveled to California State Bank at 111 East Yorba Linda Boulevard, Placentia, California, with the intention of robbing it. At approximately 6:53 a.m., two bank employees arrived at the bank in order to prepare it for the opening of the business day. As the two employees entered the door of the bank, [Halthon] and one of the other black males entered the door as planned. The remaining five waited outside in three separate cars. Moments later, [Halthon] and the other male fled from the bank building. Defendant Hicks, driving one of the three get-away cars, picked up [Halthon] before driving away from the bank."

The trial court admonished the jury that "[t]his document is to be considered only as to Mr. Hicks and on the issue of Hicks's intent during the events that are charged in this case."

### 2. Brown.

Brown established below, and now on appeal, that his trial should have been severed and he was prejudiced by being tried with Rose and Hicks.

"Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

The problem here is that the jury was dealing with a thought crime requiring mutual understanding, i.e., intent. Moreover, because the cases were jointly tried, the jury was given the impossible task of deciding the intent issue for three cases based on different evidence. In the case against Rose, the jury was required to decide the intent of Rose, Hicks and Brown using Rose's prior conviction and other evidence admissible against him. In other words, in Rose's case, the jury had to decide what was in each of their minds, and whether it matched because mutual intent in a conspiracy case, by the dictates of law, is a prerequisite. As to Hicks, the jury was required to decide the same

21

things, but considering only the evidence allowed in the People's case against Hicks. Finally, the jury was required to determine the intent of all three, and whether it matched, in the case against Brown without resorting to the evidence that was admissible only against Rose and Hicks. Given the above circumstances, the jury was required to decide Rose's and Hicks's intent in their cases, and then forget what it had already determined regarding Rose's and Hicks's intent when deciding Brown's case. This created a substantial danger of prejudice because this case required mental gymnastics that are unreasonable to expect of any jury.

The trial court's comments demonstrated that it was well aware that joining the cases against Rose and Hicks with the case against Brown might tip the jury against Brown. Given the trial court's own views, and given the impossible task facing the jury regarding the determination of Brown's intent without considering evidence admissible against Rose and Hicks, the trial court should have recognized the risk of prejudice to Brown. As a result, it abused its discretion when it denied the motion to sever with respect to Brown. The error was prejudicial, which is established by the majority vote in favor of acquittal in the second trial after the prosecutor tried Hicks and Brown without evidence of the priors.

Additionally, Brown was denied due process. An old adage comes to mind: a bell cannot be unrung. Here, once the jury decided the intent of Rose and Hicks after considering their prior convictions, it is unlikely it was able to decide that issue anew in connection with Count 1 as it related to Brown. Thus, this is a case in which we cannot say, with fair assurance, that the judgment was not substantially swayed by the error. In other words, it is impossible to conclude that Brown's right to due process was not affected.

Due to state law error and denial of due process, reversal is required.[18]

---

[18]    Brown argues that he received ineffective assistance when his attorney failed to object when the prosecutor allegedly conflated the issues of intent for all three defendants and implicitly invited the jury to look at the priors of Rose and Hicks when determining whether Brown had the requisite conspiratorial intent. Because Count 1 is being

22

When a conviction is reversed, we must determine whether there was sufficient evidence to support the conviction. If so, a retrial is permissible. But if the evidence was insufficient, then a retrial is barred by the Double Jeopardy Clause in the United States Constitution. (*People v. Grant* (2003) 113 Cal.App.4th 579, 584; *United States v. Lewis* (9th Cir. 1986) 787 F.2d 1318, 1323; *United States v. Dicesare* (9th Cir. 1985) 765 F.2d 890, 900.) On this topic, Brown offers no argument. Suffice it to say, there was sufficient evidence here to support the conviction on Count 1. The evidence that was cross-admissible showed incriminating coconspirator statements by Rose about his plans to rob a bank with a crew; on various dates, Rose was near Williams's home and bank as well as Give Kay's home and bank; during the March 9, 2010, traffic stop, Brown lied about knowing Rose; Brown said Hicks and he were in San Diego on March 9, 2010, to see Hicks's friends, but Hicks said they were there to sell the Durango to an unknown person; Brown was with Hicks when he drove away from the March 9, 2010, traffic stop using countersurveillance techniques to expose anyone following; Brown met with Rose and Hicks on April 13, 2010; the Nissan, Rose, Hicks and, inferentially, Brown were involved in the surveillance of Give Kay's home; Brown was present in Irvine on April 21, 2010, near Give Kay's home; Brown briefly met with Rose on April 23, 2010 in Inglewood; Rose possessed firearms and ammunition; Brown possessed ammunition; and in Brown's interview in which he said he saw Hicks in jail, he lied by saying they had not seen each other in a while. This evidence supported a finding that Brown conspired to commit robbery or kidnapping for robbery because it established an agreement to rob a bank and steps taken toward that goal.

      3. <u>Hicks</u>.

In our view, Hicks failed to establish a substantial danger that he would be prejudiced by being tried with Rose. At the time the trial court ruled, the evidence of Rose's prior conviction did not pose the same danger to Hicks that it did to Brown because Hicks had a prior conviction similar to Rose's. Thus, given that Hicks had a

reversed, the issue of whether Brown's counsel provided ineffective assistance is moot, and we need not resolve it.

prior conviction for aiding and abetting attempted bank robbery, the evidence of his intent arising out of his prior bad act was just as strong as the evidence of Rose's intent arising out of his prior bad act.  Also, the evidence regarding what Rose said to Hopes about his bank robbery plans was cross-admissible.  (*People v. Brown* (2003) 31 Cal.4th 518, 555 [When out-of-court statements by a coconspirator are made in the course of and in furtherance of a conspiracy, and not made under suspect circumstances, they are sufficiently reliable to require no corroboration].)[19]  So, too, was the evidence pertaining to the surveillance, GPS tracking and cell phone data, the suspicious items found in Hicks vehicle during the traffic stop, the evidence of Rose's possession of firearms and ammunition, and the evidence of Brown's possession of ammunition.  On top of that, the prosecution possessed evidence suggesting Hicks lied during the March 9, 2010, traffic stop during which he said he was returning from San Diego to sell the Durango to a person he could not identify.  Hicks's interview was incriminating because he did not provide truthful statements regarding his presence in Orange County with Rose and Hicks, thereby showing consciousness of guilty.  There was a powerful amalgamation of

---

**19**    Evidence Code section 1223 provides:  "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:  [¶]  (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;  [¶]  (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and  [¶]  (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  (Evid. Code, § 1111.)  Testimony within the meaning of Evidence Code section 1111 includes "'all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances.  The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.' [Citation.]"  (*People v. Williams* (1997) 16 Cal.4th 153, 245.)  In contrast, this rule does not apply when out-of-court statements are given under circumstances which cannot be called suspect.  (*Ibid.*)

24

evidence against Hicks from which the jury could have concluded that he had a mutual understanding with Rose and/or Brown to rob a bank. This was not a case, as Hicks would have us believe, in which a very weak case was joined with a very strong case. The case against Hicks may not have been as strong as the case against Rose, but it was a strong case. We conclude the trial court did not abuse its discretion when it denied Hicks's motion.

The question remains whether joinder resulted in substantial and injurious effect or influence in determining the jury's verdict. The answer is no. The prior bad act evidence against Rose and Hicks had the tendency to lead the jury to reach the same conclusion regarding intent; much of the evidence was cross-admissible; and the evidence surrounding the March 9, 2010, traffic stop revealed consciousness of guilt on the part of Hicks. He nonetheless suggests that the deadlocked jury during the second trial proves he was prejudiced in the third trial. This suggestions fails because the prosecutor offered no evidence of Hicks's prior bad act in the second trial but did so in the third trial. Consequently, the prosecutor presented a stronger case in the third trial, which explains the conviction.

Hicks complains there was no evidence he was aware that Rose possessed guns, ammunition and scanners. This is a red herring because if the evidence was admissible, it was cross-admissible to demonstrate that Rose was prepared to carry out the conspiracy. Next, Hicks points out that Hopes testified regarding Rose's check scheme, impliedly suggesting he therefore received an unfair trial. That evidence was tangential and proved nothing about the conspiracy, and it was unlikely to have an injurious affect on the jury's determination.

## II.  GPS Evidence Regarding the BMW and Chrysler.

In 2012, the United States Supreme Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search[]'" under the Fourth Amendment and requires a warrant. (*United States v. Jones* (2012) 132 S.Ct. 945, 949, fn. omitted (*Jones*); *People v. Mackey* (2015) 233 Cal.App.4th 32, 94 (*Mackey*).)  The pivotal question, as recognized

by Rose, is whether the FBI agents reasonably relied on binding appellate precedent as it existed in 2010 when they used GPS trackers to monitor the movements of the Chrysler and BMW. If so, the exclusionary rule does not apply. (*Id*. at pp. 94–95.) According to Rose, in 2010, there was no binding appellate precedent authorizing the monitoring of tracking data, and therefore the 2010 tracking data culled from the GPS trackers without a warrant should have been suppressed.

A series of cases defeats Rose's position, the first of which is *United States v. Knotts* (1983) 460 U.S. 276 (*Knotts*).

In *Knotts*, a beeper was placed in a five-gallon drum containing chloroform purchased by one of the respondent's codefendants and then transferred to a vehicle owned by another codefendant. The beeper emitted periodic signals that were picked up by a radio receiver. Law enforcement agents were able to track the drum as it was driven from its place of purchase to a cabin occupied by respondent. According to the court, the information could have been obtained by visual surveillance. (*Knotts*, *supra*, 460 U.S. at p. 282.) Thus, the court held the monitoring of the beeper signals did not constitute an unlawful search or seizure. (*Id*. at p. 285.)[20]

Rose would have us limit the import of *Knotts* to the beeper technology available more than 30 years ago. Further, Rose cites a passage in which *Knotts* recognized that 24-hour surveillance of a citizen might require a different analysis, and then likens such surveillance to GPS tracking. (*Knotts*, *supra*, 460 U.S. at pp. 283–284.) In our view, *Knotts* aids the People, not Rose.

Here, as in *Knotts*, the tracking data was used to track the Chrysler and BMW on public streets. Thus, the GPS trackers accomplished something that the FBI could have accomplished with visual surveillance. The fact that the GPS trackers may utilize technology that is more advanced than the beeper technology used in the 1980's does not, by itself, make GPS trackers more loathsome to the Fourth Amendment. Moreover, the

---

[20]     Relying principally on *Knotts*, *People v. Salih* (1985) 173 Cal.App.3d 1009 (*Salih*) upheld warrantless monitoring of a beeper inside a parcel because no information was obtained that was not available through visual surveillance. (*Salih*, *supra*, at p. 1016.)

GPS trackers did not provide 24-hour surveillance of Rose, as he implicitly suggests. They provided 24-hour surveillance of the Chrysler's and BMW's locations, something that did not intrude on Rose's privacy when he was in a private space. The GPS trackers did not implicate potential Fourth Amendment problems of invasive technology that, per *Knotts*, may require new analysis.

Recently, the retroactivity argument advanced by Rose was rejected in *Mackey*, a pre-*Jones* GPS tracking evidence case.[21] Citing P*eople v. Zichwic* (2001) 94 Cal.App.4th 944, 953–956 (*Zichwic*) and *United States v. McIver* (9th Cir. 1999) 186 F.3d 1119, 1126–1127 (*McIver*), *Mackey* explained that "[p]rior to *Jones*, California state courts and the Ninth Circuit had held that installation of a GPS device by law enforcement authorities was not a search governed by the Fourth Amendment because a vehicle operator had no reasonable expectation of privacy in a vehicle's exterior. [Citations.]" (*Mackey*, *supra*, 233 Cal.App.4th at p. 95.) As a result, *Mackey* held law enforcement agents surveilling a target reasonably relied on *Zichwic* and *McIver* when placing a GPS tracker on the target's vehicle in 2007, and the resultant tracking evidence was not subject to exclusion. (*Mackey*, *supra*, at p. 95.)

In *Zichwic*, police officers installed a tracking device on the defendant's truck. The next day, the tracking device allowed the police to locate the truck in front of a business. When police officers went to the business, they caught the defendant in the act of stealing tools. The defendant filed a "motion to suppress evidence of his location obtained from installation of an electronic tracking device on the undercarriage of his truck." (*Zichwic*, *supra*, 94 Cal.App.4th at p. 948.) In other words, the defendant sought suppression of the monitoring data. But on appeal, the defendant only challenged the placement of the tracking device. (*Id*. at p. 951.)

---

[21]     *Mackey* was cited by the People in the respondent's brief, but it was not addressed in Rose's reply brief.

The court followed *McIver*[22] in holding the placement of a tracking device was not a search. In dictum, *Zichwic* stated: "We observe that it is a separate question whether monitoring signals from a tracking device is a search. [Citation.] The United States Supreme Court has concluded that monitoring electronic signals does not amount to a search when the only information provided is what could be obtained through visual surveillance, such as the movements of an automobile on public thoroughfares. [Citation.] Monitoring does amount to a search when it reveals information about otherwise hidden activities inside a residence. [Citation.] In our case, monitoring the tracking device simply revealed the movements of defendant's truck on city streets. Defendant's complaint here concerns installation of the device, not the monitoring of its signals." (*Zichwic*, *supra*, 94 Cal.App.4th at p. 956.)

Here, the combination of *Knotts* and *Zichwic* supported the warrantless use of the GPS trackers on the Chrysler and BMW in 2010. Rose may complain that *Knotts* is distinguishable because law enforcement agents in that case used a combination of visual and beeper surveillance, and the surveillance here was primarily electronic. We find that distinction immaterial. What matters is the surveillance could have been accomplished visually on public streets.

## III. Uncharged Crime Evidence.

Evidence of uncharged crimes can be admitted under Evidence Code section 1101, subdivision (b) to prove some fact other than a defendant's propensity to commit a charged crime. But for the evidence to be admitted, "there must be some degree of similarity between the charged crime and the other crime[.]" (*People v. Jones* (2011) 51 Cal.4th 346, 371.) The "degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when . . . the evidence is offered to prove intent. [Citation.]" (*Ibid.*) A trial court's decision to admit evidence of another crime to prove intent will not be disturbed on appeal unless the record discloses an abuse of discretion. (*Ibid.*)

---

[22] In *McIver*, the court held that the placement of an electronic tracking device on a vehicle does not constitute a search. (*McIver*, *supra*, 186 F.3d at pp. 1126–1127.)

At trial, the prosecutor was obligated to prove Rose and Hicks had the specific intent that they and Brown would commit the elements of robbery or kidnapping for robbery per a conspiratorial agreement. Rose argues his intent was not reasonably subject to dispute if the jury believed he expressed various bank robbery preparations, plans and opinions to Hopes as stated in the testimony of Hopes and Special Agent Conley. As a result, Rose contends *Ewoldt, supra,* 7 Cal.4th at p. 406 establishes the 1996 federal offense was cumulative on the issue of intent, rendering it more prejudicial than probative. Alternatively, Rose points out that evidence of an uncharged crime comes with risk that must be weighed against probative value. Rose advocates that the uncharged crime should have been excluded because it did not have substantial probative value overcoming its inherent prejudice.

Hicks posits his uncharged crime was not sufficiently similar to the charged conspiracy to make it logical to find evidence of intent related to the former is evidence of intent for the latter. He maintains the only relevance of his uncharged crime was as impermissible bad character evidence, and therefore the admission of that evidence violated his right to due process.[23]

For reasons highlighted below, we cannot concur.

*Ewoldt* involved acts of molestation leading to a lewd conduct charge. The court noted: "If defendant engaged in this conduct, his intent in doing so could not reasonably be disputed. [Citations.] As to these charges, the prejudicial effect of admitting evidence of similar uncharged acts, therefore, would outweigh the probative value of such evidence *to prove intent*." (*Ewoldt*, *supra*, 7 Cal.4th at p. 406.) Underlying *Ewoldt* is the simple idea that direct evidence of a crime such as lewd conduct speaks for itself

---

[23]    Hicks acknowledges that the United States Supreme Court and California Supreme Court have never expressly held that admission of bad character evidence is a violation of due process. For example, in *Estelle v. McGuire* (1991) 502 U.S. 62, 75, fn. 5, the Court expressed "no opinion on whether state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."

regarding intent, and evidence of similar uncharged acts would be cumulative and, for that reason, a possible candidate for exclusion under Evidence Code section 352. (*People v. Leon* (2008) 161 Cal.App.4th 149, 168–169 [in *Ewoldt* the Supreme Court emphasized that where uncharged offense evidence is cumulative, it will often be inadmissible pursuant to Evid. Code, § 352]; *People v. Tran* (2011) 51 Cal.4th 1040, 1049 (*Tran*) ["The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute"].)

Regarding uncharged crimes, the court in *People v. Thompson* (1980) 27 Cal.3d 303, 317, fn. omitted (*Thompson*) stated: "As Wigmore notes, admission of this evidence produces an 'over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts.' [Citation.] It breeds a 'tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences . . . .' [Citation.] Moreover, 'the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor.' [Citation.]" Within that context, the court recognized Evidence Code section 352 requires the probative value of the evidence to outweigh its prejudicial effect (*Thompson*, *supra*, at p. 318, fn. omitted), and stated: "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded. [Citation.]" (*Ibid.*) "Probative value goes to the *weight* of the evidence of other offenses. The evidence is probative if it is material, relevant, and necessary. '[How] much "probative value" proffered evidence has depends upon the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality), and the necessity of proving the issue by means of this particular piece of evidence (degree of necessity).' [Citations.]" (*Id.* at p. 318, fn. 20.)

Unlike *Ewoldt*, the case against Rose and Hicks involved a conspiracy. The only evidence that Rose, Hicks and Brown entered into an agreement to commit kidnapping

for robbery and second degree robbery was circumstantial, i.e., they were seen casing banks and the homes of bank managers, Rose possessed firearms and ammunition, Brown possessed ammunition, Rose expressed various plans to Hopes, and the defendants lied to law enforcement agents and therefore displayed consciousness of guilt. The evidence was subject to attack by the defense because it required interpretation and potentially gave rise to inferences of conspiracies not charged. And because the FBI paid Hopes $4,000, Hopes's motives for testifying was also subject to attack. Thus, while there was evidence of intent aside from the uncharged acts, the uncharged act evidence was not "merely cumulative" (*Tran*, *supra*, 51 Cal.4th at p. 1049) because it served to corroborate the inferences of intent offered by the prosecution, and to bolster the veracity of Hopes. These observations lead us to conclude that the evidence had substantial probative value because there was a high degree of relevance, materiality and necessity, and any concomitant prejudicial effect did not require exclusion. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 715 (*Lopez*) [uncharged offenses are admissible only if they have substantial probative value].)[24]

Moving on, we reject the idea that the charged crimes and uncharged crimes were not sufficiently similar. The question is the logical relevance of the uncharged crimes to establish the mental element of the charged crimes. (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1395.) "'The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the

---

[24] *Lopez*, also cited by Rose, does not alter our conclusion. It indicated that the evidence of a burglary showed that someone entered the kitchen of a residence and took two purses. This led the court to state: "Assuming appellant committed the alleged conduct, his intent in so doing could not reasonably be disputed— there could be no innocent explanation for that act. Thus, the prejudicial effect of admitting evidence of a prior car burglary and prior car theft outweighed the probative value of the evidence to prove intent as to the . . . burglary charge. [Citation.]" (*Lopez*, *supra*, 198 Cal.App.4th at p. 715.) Like *Ewoldt*, *Lopez* involved *physical* acts that were the foundations of the crimes that brooked no dispute as to intent. Here, the foundation of the conspiracy crime was a *mental* act that, absent direct evidence, required proof through triangulation of multiple sources of circumstantial evidence.

31

actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' [Citation.]" (*Ibid*.)  Here, where both crimes involved plans to rob banks, the inference to be drawn is that Rose and Hicks intended that they and Brown would rob a bank per their conspiracy.  Though there are differences between the uncharged crimes and the charged crime, which Rose and Hicks attempt to parse to their benefit, the differences pale in comparison to the similarity of the goal of the uncharged crimes to the charged crimes, i.e., to rob banks.  Moreover, the least degree of similarity is needed when an uncharged crime is offered to prove intent.

Finally, we easily reject any suggestion the uncharged crimes were used to prove bad character and conformity with that bad character.  The trial court instructed the jury that the evidence could only be used on the issue of intent.  And, as we explained above, it was sufficiently similar to be relevant.

Because we conclude that the evidence was not used as bad character evidence, it is unnecessary and against wise appellate principles for us to reach Hicks's due process argument.  A reviewing court will not decide constitutional issues where an appeal can be resolved on other grounds.  (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230.)

## IV.  Issues Raised by Brown and Joined by Rose and Hicks.

Rose and Hicks join Brown's arguments that the trial court erred when it (1) refused to grant a continuance so they could prepare for an expert's charts provided by the prosecution in violation of reciprocal discovery statutes; (2) instructed the jury about the late discovery pursuant to CALCRIM No. 306; (3) admitted evidence of weapons, ammunition, weapons parts, a gun holster, a scanner and walkie-talkies found in residences associated with Rose and Brown; and (4) refused to suppress a phone number provided by Brown when he was booked.[25]  Brown contends the trial court committed state law error, and he was denied due process.

---

[25]     With respect to certain issues, Brown contends he received ineffective assistance of counsel.  He does not contend the same as to Rose and Hicks.  Because Brown's

State law error is reversible only where, pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), it is reasonably probable that the defendant would have obtained a better result absent the error. If an error implicates a defendant's due process rights, then *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies, i.e., the error is reversible unless it was harmless beyond a reasonable doubt. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)

We need not determine whether state or federal law was violated because Rose and Hicks have not analyzed whether they were prejudiced under either the *Watson* or *Chapman* standards. "To the extent [a] defendant perfunctorily asserts . . . claims, without development . . . , they are not properly made . . . ." (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19.)

## V. The Enhancement for Principal Armed with a Firearm.

"Section 12022, subdivision (a)(1) provides that 'any person who is armed with a firearm' during the commission of a felony shall receive a one-year enhancement, and that this enhancement applies to any principal in the commission of the offense regardless whether such person is personally armed with a firearm. [Citations.]" (*People v. Overten* (1994) 28 Cal.App.4th 1497, 1502–1503.) Arming "under the sentence enhancement statues does not require that a defendant utilize a firearm or even carry one on the body. A defendant is *armed* if the defendant has the specified weapon available for use, either offensively or defensively." (*People v. Bland* (1995) 10 Cal.4th 991, 997 (*Bland*).) In addition, "a defendant is 'armed with a firearm' . . . if he or she participates as a principal in a crime in which one or more principals is armed. [Citation.]" (*People v. Paul* (1998) 18 Cal.4th 698, 706.) An enhancement will be upheld if it is based on substantial evidence upon which a trier of fact could find the underlying allegation true beyond a reasonable doubt. (*People v. Ledesma* (2006) 39 Cal.4th 641, 722; *People v. Vega* (2005) 130 Cal.App.4th 183, 189; *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 129.)

---

arguments do not inure to the benefit of Rose and Hicks, we conclude those arguments are not part of their joinders.

Hicks maintains that there was insufficient evidence to support the special allegation that a principal was armed with a firearm, and he seeks reversal of the enhancement under former section 12022, subdivision (a)(1). Because Rose and Brown received the same enhancement, they join the argument.

At best, the evidence suggested that Rose stored two firearms in a closet in Fuller's apartment. The question is, assuming that those firearms belonged to Rose, whether he was "armed."

In *People v. Reaves* (1974) 42 Cal.App.3d 852 (*Reaves*), the court examined the legislative intent behind arming enhancements. It expounded on the topic as follows: "The desire of the Legislature to prevent death and injury as a result of the involvement of firearms in the commission of crime is manifest from the various provisions for increased punishment for crimes where firearms are in some way involved. The underlying intent of the Legislature is to deter persons from creating a potential for death or injury resulting from the very presence of a firearm at the scene of the crime. Thus there is aggravated punishment for a person who is armed with a deadly weapon even though no use is made of the weapon." (*Reaves, supra,* at pp. 927–928.)

Citing *Reaves*, both *People v. Wandick* (1991) 227 Cal.App.3d 918, 928 (*Wandick*) and *Bland* reiterated that the legislative intent is "to deter persons from creating a potential for death or injury resulting from the very presence of a firearm at the scene of the crime[.]" (*Wandick*, *supra*, at p. 928; *Bland*, *supra*, 10 Cal.4th at p. 996.) It is therefore apparent that a firearm must be present at the scene of a crime for former section 12022, subdivision (a)(1) to apply.

Using these cases as a roadmap, we must determine whether the firearms were present during the commission of the conspiracy. The answer is no.

We easily conclude that this case is distinguishable from *Bland*. In *Bland*, the police found a weapon and drugs in close proximity, and the court upheld an enhancement under former section 12022, subdivision (a)(1) because "the jury could reasonably infer that, at some point, . . . defendant was physically present with both the drugs and the weapon, giving him ready access to the [weapon] to aid his commission of

the drug offense." (*Bland*, *supra*, 10 Cal.4th at p. 1000.)  Here, there was no basis for the jury to infer that firearms were present during the commission of the conspiracy, i.e., when the conspiracy was formed, or when overt acts were committed, because there was no evidence that Rose physically possessed the firearms while committing conspiratorial acts, or that any part of the conspiracy was committed at Fuller's apartment while the firearms were being stored in her closet.  The inescapable upshot is that the enhancements must be reversed.

Tellingly, the People offer no basis for us to reach a contrary conclusion.  Instead of arguing that Rose was armed, the People instead argue that he was in constructive possession of the two firearms.  They cite *In re Daniel G.* (2004) 120 Cal.App.4th 824, 831 [unlawful possession of an assault weapon], *People v. Peña* (1999) 74 Cal.App.4th 1078, 1083–1084 [unlawful possession of a weapon while under the influence of drugs], and *People v. Rushing* (1989) 209 Cal.App.3d 618, 622–623 [unlawful possession of a controlled substance].  We need not address this argument because it is not relevant to whether Rose was "armed with a firearm in the commission of a felony" under former section 12022, subdivision (a)(1).

## VI.  Rose's Judgment and Abstract of Judgment.

Section 1465.8, subdivision (a)(1), mandates that an assessment of $40 be imposed "on every conviction for a criminal offense[.]"  Government Code section 70373, subdivision (a)(1), mandates that an assessment of $30 be imposed "for each misdemeanor or felony."  According to the People, the trial court imposed a section 1465.8, subdivision (a)(1) assessment and a Government Code section 70373 assessment on Rose for Count 1 but not for Count 2 and Count 3.  The People ask us to impose those assessments with respect to Count 2 and Count 3, and then amend the judgment to reflect the imposition of those assessments.  (*People v. Robinson* (2012) 209 Cal.App.4th 401, 405.)

We have reviewed the record and conclude the trial court complied with its obligations to impose assessments.  At sentencing, the trial court stated, inter alia, "Regarding the court security fine of $40, [Rose] has to pay that three times because [of]

35

the three convictions.  So it's $120.  And the court construction fee under the Government Code of $30 is, again, multiplied by three for a $90 fine."  The trial court's minute order establishes that three assessments of $40 were imposed on Rose pursuant to section 1465.8, subdivision (a)(1), and three assessments of $30 were imposed on Rose pursuant to Government Code section 70373.  As to Count 1, the abstract of judgment provides a $40 court security fee pursuant to section 1465.8 and a criminal conviction assessment of $30 pursuant to Government Code section 70373.  With respect to Count 2 and Count 3, the assessments are combined and total, respectively, $80 and $60.

Given the foregoing, there is no need for us to impose additional assessments and amend the abstract of judgment.

## DISPOSITION

The firearm enhancements are stricken.  The judgment against Brown on Count 1 is reversed.  On remand, the People may seek a retrial.  The judgments against Rose and Hicks are modified to reflect that there is no firearm enhancement, and the abstract of judgment shall be amended accordingly.  Otherwise, the judgments against Rose and Hicks are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
BOREN


_____, J.
CHAVEZ

36